FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 0 2 2023

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **GREG HALE, ALICIA GILMORE, MICHAEL WHITKANACK, AND JESSICA WHITE**, on behalf of themselves and all others similarly situated, <br><br>            **Plaintiffs,** <br><br> v. <br><br> **ARCARE, INC.,** <br><br>            **Defendant.** | Case No. 3:22-CV-117-BSM <br><br> Judge Brian S. Miller <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Greg Hale, Alicia Gilmore, Michael Whitkanack and Jessica White ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendant ARcare, Inc. ("ARcare" or "Defendant"), an Arkansas corporation, to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### I. NATURE OF THE ACTION

1.      This class action arises out of the recent targeted cyberattack and data breach (the "Data Breach") on ARcare's network that resulted in the unauthorized access and compromise of its employees', customers', and patients' sensitive information. The information compromised in the Data Breach included Plaintiffs' and Class Members' names, dates of birth, Social Security

1

numbers ("PII"), medical treatment information, prescription information, medical diagnosis or condition information, and health information ("PHI") (collectively, "Private Information").

2.      As a result of the Data Breach, Plaintiffs and approximately 345,353 Class Members[1] are now at an imminent and ongoing risk of identity theft and fraud. Moreover, Plaintiffs and Class members have suffered ascertainable financial losses due to the loss of the benefit of their bargain, past and future out-of-pocket expenses, diminution of value of their Private Information, and the lost value of their time reasonably incurred to remedy or mitigate the effects of the attack.

3.      Plaintiffs bring this class action lawsuit on behalf of themselves and those similarly situated to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' Private Information that Defendant collected and maintained, and for Defendant's failure to (1) provide timely and adequate notice to Plaintiffs and other Class Members that their Private Information had been subject to the unauthorized access of an unknown third party, and (2) identify precisely what specific type of information was accessed.

4.      Defendant maintained the Private Information in a negligent and/or reckless manner. In particular, the Private Information was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition and increased the risk of theft.

---

[1] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Apr. 10, 2023) (search "ARcare" in advance search field).

5.      Upon information and belief, Plaintiffs' and Class Members' Private Information that was stored on ARcare's compromised systems was exfiltrated and stolen in the Data Breach and is now in the hands of data thieves.

6.      Armed with the Private Information accessed and acquired in the Data Breach, data thieves can commit a variety of sordid crimes including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

7.      As a result of the Data Breach, Plaintiffs and Class Members are at an imminent and ongoing risk of medical and financial fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts and medical information to guard against identity theft.

8.      Plaintiffs and Class Members will also reasonably and necessarily incur future out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

9.      Plaintiffs seek to remedy these personal and financial harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

10.      Plaintiffs seek legal and equitable remedies including, but not limited to, compensatory damages, nominal damages, punitive damages, reimbursement of past and future

out-of-pocket costs, restitution, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

11.      Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) Negligence, (ii) Breach of Implied Contract; (iii) Unjust Enrichment, (iv) Breach of Fiduciary Duty, and (v) Declaratory Judgment/Injunctive Relief.

## II. THE PARTIES

### A.    *Plaintiffs*

12.      **Plaintiff Greg Hale** is a natural person, resident, and a citizen of the State of Arkansas. Plaintiff Hale is a former patient of ArCare and a victim of the Data Breach.

13.      **Plaintiff Alicia Gilmore** is a natural person, resident, and a citizen of the State of Arkansas. Plaintiff Gilmore is a former patient of ArCare and a victim of the Data Breach.

14.      **Plaintiff Michael Whitkanack** is a natural person, resident, and a citizen of the State of Arkansas. Plaintiff Whitkanack is a former patient of ArCare and a victim of the Data Breach.

15.      **Plaintiff Jessica White** is a natural person, resident, and a citizen of the State of Arkansas. Plaintiff White is a former patient of ArCare and a victim of the Data Breach.

### B.    *Defendant*

16.      **Defendant ARcare, Inc.** is an Arkansas corporation with its principal place of business and headquarters at 117 South 2nd Street, Augusta, Arkansas.

## III. JURISDICTION AND VENUE

17.      This Court has original jurisdiction under the Class Action Fairness Act, 28

U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. The Defendant operates and solicits and offers medical services to patients in three different States, i.e., Arkansas, Mississippi, and Kentucky. Notice of the Data Breach has been sent to patients who are citizens and residents of states other than Arkansas. Therefore, many members of the Class and Defendant are citizens of different states.

18.     The Eastern District of Arkansas has personal jurisdiction over Defendant ARcare because Defendant is headquartered in this District and Defendant conducts substantial business in Arkansas and this District through its headquarters, offices, parents, and affiliates.

19.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and ARcare conducts substantial business in this District.

## IV. DEFENDANT'S BUSINESS

20.     ARcare is a healthcare provider that provides primary care, behavioral health, pharmacies, community outreach programs, and more to patients.[2]

21.     ARcare began in rural Arkansas in 1986 and has a mission of bringing "superior healthcare to patients, regardless of their ability to pay" and treats patients from infancy to retirement.[3]

22.     ARcare is a federally qualified health center with discounted rates, which enables it to treat patients with and without insurance.[4]

---

[2] *Our Story*, ARCARE, https://www.arcare.net/our-story/ (last visited Apr. 10, 2023).

[3] *Id.*

[4] *Id.*

23.     ARcare is a healthcare system with over 74 facilities across Arkansas, Kentucky and Mississippi.[5]

24.     ARcare is an Arkansas nonprofit corporation with its headquarters located at 117 South 2nd Street, Augusta, Arkansas 72006.

## V. <u>FACTUAL ALLEGATIONS</u>

### A. *Background*

23.     ARcare promises that it will protect its patients' privacy and remain in compliance with statutory privacy requirements. In fact, ARcare states in its Privacy Statement posted on its website that:

> Our practice is dedicated to maintaining the privacy of your individually identifiable health information as protected by law, including the Health Information Portability and Accountability Act (HIPAA). In conducting our business, we will create records regarding you and the treatment and services we provide to you. We are required by law to maintain the confidentiality of information that identifies you. We also are required by law to provide you with this notice of our legal duties and the privacy practices that we maintain in our practice concerning your Personally Identifiable Information (PII). By federal and state law, we must follow the terms of the notice of privacy practices that we have in effect at the time.
>
> We realize that these laws are complicated, but we must provide you with the following important information:
>
> - How we may use and disclose your PII
> - Your privacy rights in your PII
> - Our obligations concerning the use and disclosure of your PII[6]

24.     Plaintiffs and the Class Members, as current and former ARcare patients, and/or current and former ARcare employees, relied on these expressed and implied promises and on

---

[5] *Our Locations*, ARCARE, https://www.arcare.net/locations/ (last visited Apr. 10, 2023).

[6] *ARcare's Privacy Statement*, ARCARE, https://www.arcare.net/privacy-statement/ (last visited Apr. 10, 2023).

this sophisticated entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Patients demand security to safeguard their Private Information, especially when medical information and Social Security numbers are involved.

25.     ARcare had an independent duty, and further assumed such duty, to adopt reasonable measures to protect Plaintiffs' and Class Members' Private Information from involuntary disclosure to third parties.

C.     *The Data Breach*

26.     Beginning on or about April 25, 2022, ARcare notified many of its patients, current and former employees, and state Attorney Generals about a widespread data security incident involving sensitive PII and PHI of certain current and former customers.

27.     According to the notice ARcare provided, ARcare learned on February 24, 2022, that there was unauthorized activity on ARcare's network that resulted in unauthorized third-party access to and/or acquisition of confidential information of ARcare patients.

28.     Through an investigation, ARcare determined that an unauthorized individual or individuals had access to its systems between January 18, 2022, and February 24, 2022 (*i.e.*, unauthorized access over thirty-eight (38) calendar days).[7] This access exposed hundreds of thousands of patients' Private Information to criminals.

29.     The confidential information that was accessed without authorization included dates of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, health information, and names.

---

[7] *RE: ARcare – Notice of Data Privacy Incident*, CISION PR NEWSWIRE (Apr. 25, 2022), https://www.prnewswire.com/news-releases/re-arcare--notice-of-data-privacy-incident-301532031.html (last visited Apr. 10, 2023).

30.     Upon information and belief, the Private Information was not encrypted prior to the Data Breach.

31.     Upon information and belief, the cyberattack was targeted at ARcare due to its status as a health services provider that collects valuable personal and health information on its many customers, as well as its employees.

32.     Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the Private Information of Plaintiffs and the Class Members.

33.     On or about April 25, 2022, ARcare sent current and former patients and current or former employees a Notice of Data Breach, informing the recipients of the notice that their confidential data was involved, and stating:

> **What Happened?** On February 24, 2022, ARcare learned of a data security incident affecting its systems. ARcare immediately worked to secure its systems and quickly commenced an investigation to confirm the nature and scope of the incident. Through that investigation, ARcare determined that your information was in files that a third party may have accessed or acquired without authorization.

> **What Information Was Involved?** As indicated above, ARcare is unaware of any actual misuse of your Private Information . However, the information present in the files that were accessed and/or acquired as a result of the incident may have included your date of birth, Social Security Number, medical treatment information, prescription information, medical diagnosis or condition information, health insurance information, and name.

> **What We Are Doing.** ARcare treats its responsibility to safeguard information in its care as an utmost priority. As such, ARcare responded immediately to this incident and has worked diligently to provide you with an accurate and complete notice of the incident as soon as possible. As part of its ongoing commitment to the privacy and security of Private Information in its care, ARcare is reviewing and updating existing policies and procedure relating to data protection and security. ARcare is also investigating additional security measures to mitigate any risk associated

with this incident and to better prevent future similar incidents. ARcare is providing notice of this incident to potentially impacted individuals and to regulators where required.

Out of an abundance of caution, ARcare is providing you with 12 months of complimentary access to credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed identity theft recovery services through IDX, as well as guidance on how to better protect your information, should you feel it is appropriate to do so. Although ARcare is covering the cost of these services, due to privacy restrictions, you will need to complete the activation process yourself. Please note the deadline for enrollment is July 25, 2022.[8]

34.     ARcare admitted in the Notice of Data Breach and the letters to the Attorneys General that their systems were subjected to unauthorized access that involved a database that contained Class Members' Private Information and that Class Members' Private Information was both accessed and acquired. There is no indication that the accessed and exfiltrated Private Information was ever retrieved from the cybercriminals who took it.

35.     Upon information and belief, Plaintiffs' Private Information was contained in the database that was accessed and acquired by the criminal third party.

36.     ARcare's offer of credit and identity monitoring services and ARcare's suggestion to "Monitor Your Accounts" is an acknowledgment by ARcare that the impacted customers are subject to an imminent threat of identity theft and financial fraud.

37.     In response to the Data Breach, ARcare states, it "is reviewing and updating existing policies and procedure relating to data protection and security. ARcare is also investigating additional security measures to mitigate any risk associated with this incident and to better prevent future similar incidents."[9]

---

[8] *See* Exhibit 1 to Original Complaint (Notice of Data Breach letter).
[9] *Id.*

38.     ARcare had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

39.     Plaintiffs and Class Members provided their Private Information to ARcare with the reasonable expectation and mutual understanding that ARcare would comply with its obligations and representations to keep such information confidential and secure from unauthorized access.

40.     ARcare failed to uphold its obligations to Plaintiffs and Members of the Class. As a result, Plaintiffs and Class Members have been significantly harmed and will be at a high risk of identity theft and financial fraud for many years to come.

41.     ARcare did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining, causing Plaintiffs' and Class Members' Private Information to be exposed.

**D.     *Plaintiffs' Individual Experiences***

   ***i.   Plaintiff Greg Hale's Experience***

42.     Plaintiff Hale received medical care and treatment at ARcare in the past. Upon information and belief, during the course of the visits, he was presented with standard medical forms to complete prior to his service that requested his PII and PHI, including HIPAA and privacy disclosure forms.

43.     As part of his care and treatment, and as a requirement to receive Defendant's services, Plaintiff Hale entrusted his PII, PHI, and other confidential information such as name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information to ARcare with the

10

reasonable expectation and understanding that ARcare would take at a minimum industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to her. Plaintiff Hale would not have used ARcare's services had he known that ARcare would not take reasonable steps to safeguard his Private Information.

44.     In April 2022, more than two months after ARcare learned of the Data Breach, Plaintiff Hale received a letter from ARcare notifying him that his Private Information had been improperly accessed and/or obtained by unauthorized third parties. The notice indicated that Plaintiff Hale's Private Information, including his full name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information was compromised as a result of the Data Breach.

45.     As a result of the Data Breach, Plaintiff Hale made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements. He also intends to order a copy of his credit report and reach out to his insurance company to review those records as well to ensure that he has not been subject to any fraud. Plaintiff Hale also changed passwords on his accounts.

46.     Plaintiff Hale has spent hours and will continue to spend valuable time dealing with the Data Breach that Plaintiff Hale otherwise would have spent on other activities, including but not limited to work and/or recreation.

47.     Plaintiff Hale suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that ARcare obtained from

Plaintiff Hale; (b) violation of his privacy rights; (c) the likely theft of his Private Information; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

48.          As a result of the Data Breach, Plaintiff Hale has also suffered emotional distress as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff Hale is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

49.          As a result of the Data Breach, Plaintiff Hale anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Hale will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

### ii.  *Plaintiff Alicia Gilmore's Experience*

50.          Plaintiff Gilmore received medical care and treatment at ARcare in the past. Upon information and belief, during the course of the visits, she was presented with standard medical forms to complete prior to her service that requested her PII and PHI, including HIPAA and privacy disclosure forms.

51.          As part of her care and treatment, and as a requirement to receive Defendant's services, Plaintiff Gilmore entrusted her PII, PHI, and other confidential information such as name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information to ARcare with the reasonable expectation and understanding that ARcare would take at a minimum industry standard precautions to protect, maintain, and safeguard that information from unauthorized

12

users or disclosure, and would timely notify her of any data security incidents related to her. Plaintiff Gilmore would not have used ARcare's services had she known that ARcare would not take reasonable steps to safeguard her Private Information.

52.        In April 2022, more than two months after ARcare learned of the Data Breach, Plaintiff Gilmore received a letter from ARcare notifying her that her Private Information had been improperly accessed and/or obtained by unauthorized third parties. The notice indicated that Plaintiff Gilmore's Private Information, including her full name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information was compromised as a result of the Data Breach.

53.        As a result of the Data Breach, Plaintiff Gilmore made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements. She ordered a copy of her credit report and reached out to her insurance company to review those records as well to ensure that she has not been subject to any fraud. She also changed all of her passwords. Plaintiff Gilmore has spent countless hours monitoring all of her accounts and continues to do so on a weekly basis.

54.        Plaintiff Gilmore has spent hours and will continue to spend valuable time dealing with the Data Breach that Plaintiff Gilmore otherwise would have spent on other activities, including but not limited to, work and/or recreation.

55.        Plaintiff Gilmore suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that ARcare

obtained from Plaintiff Gilmore; (b) violation of her privacy rights; (c) the likely theft of her Private Information; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

56.      As a result of the Data Breach, Plaintiff Gilmore has also suffered emotional distress as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Gilmore is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

57.      Plaintiff Gilmore received notifications from her bank credit monitoring service indicating that her information has been found on the dark web.

58.      As a result of the Data Breach, Plaintiff Gilmore anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Gilmore will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

### iii. Plaintiff Michael Whitkanack's Experience

23.      Plaintiff Whitkanack has received medical care and treatment through ARCare in the past. Upon information and belief, during the visits, he was presented with standard medical forms to complete prior to his service that requested his PII and PHI, including HIPAA and privacy disclosure forms.

24.      As part of his care and treatment, and as a requirement to receive Defendant's services, Plaintiff Whitkanack entrusted his PII, PHI, and other confidential information such as name, date of birth, Social Security number, medical treatment information,

prescription information, medical diagnosis or condition information, and health information to ARcare with the reasonable expectation and understanding that ARcare would take at a minimum industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify his of any data security incidents related to him. Plaintiff Whitkanack would not have used ARcare's services had he known that ARcare would not take reasonable steps to safeguard his Private Information.

25.     In April 2022, more than two months after ARcare learned of the Data Breach, Plaintiff Whitkanack received a letter from ARcare notifying him that his Private Information had been improperly accessed and/or obtained by unauthorized third parties. The notice indicated that Plaintiff Whitkanack's Private Information, including his full name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information was compromised as a result of the Data Breach.

26.     As a result of the Data Breach, Plaintiff Whitkanack made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including cancelling his credit cards, which he can now no longer use. He also intends to order a copy of his credit report and reach out to his insurance company to review those records as well to ensure that he has not been subject to any fraud.

27.     Plaintiff Whitkanack has spent hours and will continue to spend valuable time dealing with the Data Breach that he otherwise would have spent on other activities, including, but not limited to, work and/or recreation.

28.     Plaintiff Whitkanack suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage

to and diminution in the value of his Private Information, a form of property that ARcare obtained from Plaintiff Whitkanack; (b) violation of his privacy rights; (c) the likely theft of his Private Information; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

29.      As a result of the Data Breach, Plaintiff Whitkanack has also suffered emotional distress as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff Whitkanack is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

30.      Plaintiff Whitkanak has also received a greatly increased amount of spam email, solicitations for credit cards, and potential fraud, in the wake of the data breach.

31.      As a result of the Data Breach, Plaintiff Whitkanack anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Whitkanack will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

### iv. Plaintiff White's Experience

59.      Plaintiff White received medical care and treatment at ARcare in the past. Upon information and belief, during the course of the visits, she was presented with standard medical forms to complete prior to her service that requested her PII and PHI, including HIPAA and privacy disclosure forms.

60.      As part of her care and treatment, and as a requirement to receive Defendant's services, Plaintiff White entrusted her PII, PHI, and other confidential information

such as her name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information to ARcare with the reasonable expectation and understanding that ARcare would take at a minimum industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her. Plaintiff White would not have used ARcare's services had she known that ARcare would not take reasonable steps to safeguard her Private Information.

61.     In April 2022, more than two months after ARcare learned of the Data Breach, Plaintiff White received a letter from ARcare notifying her that her Private Information had been improperly accessed and/or obtained by unauthorized third parties. The notice indicated that Plaintiff White's Private Information, including her full name, date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, and health information was compromised as a result of the Data Breach.

62.     As a result of the Data Breach, Plaintiff White made reasonable efforts to mitigate the impact of the Data Breach after receiving the ARcare data breach notification letter, including but not limited to researching the Data Breach and reviewing credit card and financial account statements. Plaintiff White also signed up for credit monitoring services to monitor her accounts.

63.     Plaintiff White has spent hours and will continue to spend valuable time dealing with the Data Breach that Plaintiff White otherwise would have spent on other activities, including but not limited to work and/or recreation.

64.     Plaintiff White suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and

diminution in the value of her Private Information, a form of property that ARcare obtained from Plaintiff White; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

65.        Since the Data Breach, Plaintiff White has suffered medical fraud resulting from the Data Breach. On March 10, 2022, Plaintiff White received an invoice from an unfamiliar medical entity. The invoice, sent to Plaintiff White's home address, charged Plaintiff White $65.00 for medical services she never received.

66.        Further, on November 9, 2022, Plaintiff White received confirmation from IDX credit monitoring that her Personal Information was found on the Dark Web. Plaintiff White continues to receive notices from IDX that her Private Information is available for sale to third parties.

67.        As a result of the Data Breach, Plaintiff White has suffered emotional distress as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff White is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

68.        As a result of the Data Breach, Plaintiff White anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff White will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

   **E.    *The Data Breach Was a Foreseeable Risk of which ARcare Was on Notice***

69.            Upon information and belief, and based on the type of cyberattack, along with public news reports, it is plausible and likely that Plaintiffs' Private Information was stolen in the Data Breach. Plaintiffs further believe their Private Information was likely subsequently sold on the dark web or in active data broker markets following the Data Breach, as that is the *modus operandi* of all cybercriminals.

70.            Defendant had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

71.            Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

72.            Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

73.            In light of recent high profile data breaches at other healthcare partner and provider companies, Defendant knew or should have known that their electronic records and patient and customer Private Information would be targeted by cybercriminals and ransomware attack groups.

74.            Indeed, cyberattacks on medical systems like Defendant's have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller

municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

75.         In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[11]

76.    ˙     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

F.     *Value of PII and PHI*

77.         PII remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information  can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[12] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[13] Criminals can also purchase access to entire company data breaches from

---

[10] Ben Kochman, *FBI, Secret Service Warn of Targeted*, LAW360 (Nov. 18, 2019, 9:44 PM), available    at    https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[11] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), available at  https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[12] Anita George, *Your Personal Data is for Sale on the Dark Web. Here's How Much it Costs*, DIGITAL TRENDS (Oct. 16, 2019), available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[13] Zachary Ignoffo, *Dark Web Price Index 2021*, PRIVACY AFFAIRS (Dec. 10, 2022) https://www.privacyaffairs.com/dark-web-price-index-2021/.

$900 to $4,500.[14]

78.      Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

79.      This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[15]

80.      With Private Information, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

81.      Marketing firms utilize Private Information to target potential customers, and an entire economy exists related to the value of personal data.

82.      There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

---

[14] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr. 10, 2023).

[15] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD, (Feb. 6, 2015, 5:49 AM), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[16] *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, Report to Congressional Requesters, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737 (June 2007), available at https://www.gao.gov/assets/gao-07-737.pdf.

83.          Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

84.          Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

### G.     Defendant Failed to Properly Protect Plaintiffs' and Class Members' Private Information

85.          Defendant could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

86.          Upon information and belief, Defendant failed to encrypt or redact Plaintiffs' and Class Members Private Information. Had this information been properly encrypted, the cybercriminals would not have been able to readily decipher the information.

87.          Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to companies and educational organizations like Defendant to protect and secure sensitive data they possess.

88.          Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

22

89.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

90.     To prevent and detect unauthorized cyberattacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts

---

[17] *See generally Fighting Identity Theft with the Red Flags Rule: A How-To Guide for Business*, FEDERAL TRADE COMMISSION (May 2013), https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last visited Apr. 10, 2023).

should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[18]

91.     To prevent and detect cyberattacks, including the cyberattack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the United

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks....

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet

---

[18] *How to Protect Your Networks from RANSOMWARE*, FEDERAL BUREAU OF INVESTIGATION, pp. 3–4, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Apr. 10, 2023).

for the sender organization's website or the topic mentioned in the email).
Pay attention to the website addresses you click on, as well as those you
enter yourself. Malicious website addresses often appear almost identical
to legitimate sites, often using a slight variation in spelling or a different
domain (e.g., .com instead of .net)....

- **Open email attachments with caution**. Be wary of opening email
attachments, even from senders you think you know, particularly when
attachments are compressed files or ZIP files.

- **Keep your Private Information safe**. Check a website's security to
ensure the information you submit is encrypted before you provide it....

- **Verify email senders**. If you are unsure whether or not an email is
legitimate, try to verify the email's legitimacy by contacting the sender
directly. Do not click on any links in the email. If possible, use a previous
(legitimate) email to ensure the contact information you have for the
sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity
threats and up to date on ransomware techniques. You can find
information about known phishing attacks on the Anti-Phishing Working
Group website. You may also want to sign up for CISA product
notifications, which will alert you when a new Alert, Analysis Report,
Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus
software, firewalls, and email filters—and keep them updated—to reduce
malicious network traffic....[19]

92.     To prevent and detect cyberattacks, including the cyberattack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the Microsoft

Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

---

[19] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY
(released  Apr.  11,  2019)  (revised  Sept.  2,  2021),  https://www.cisa.gov/news-
events/news/protecting-against-ransomware (last visited Apr. 10, 2023).

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[20]

93.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

**H.     *Defendant Fails to Comply with FTC Guidelines***

94.             The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[20] *See Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT (Mar. 5, 2020) https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

95.        In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information  that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

96.        The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

97.        The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98.        These FTC enforcement actions include actions against healthcare

---

[21] *Protecting Private Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[22] *Id.* at 21.

providers like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

99.         Defendant failed to properly implement basic data security practices.

100.        Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

## I.    *Defendant Fails to Comply with Healthcare Industry Standards*

101.        As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

102.        Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

103.        Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting of physical security systems; protection against any possible communication system; and training staff regarding critical points.

104.　　　Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

105.　　　These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

### J.　　Defendant's Conduct Violates HIPAA

106.　　　HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

107.　　　Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

108.　　　Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

109.     A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

110.     The Data Breach resulted from a combination of insufficiencies that demonstrate ARcare failed to comply with safeguards mandated by HIPAA regulations.

**K.     *Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft***

111.     Cyberattacks and data breaches at healthcare providers like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

112.     Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[23]

113.     Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[24]

114.     The United States Government Accountability Office released a report in

---

[23] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019, 9:15 AM), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[24] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971–80 (2019), available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

115.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or Private Information through means such as spam phone calls and text messages or phishing emails.

116.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

---

[25] *See Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, Report to Congressional Requesters, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737 (June 2007), available at https://www.gao.gov/assets/gao-07-737.pdf.

117.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

118.     The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[28] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[29] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

119.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

120.     An individual cannot obtain a new Social Security number without significant

---

[26] *See What to do Right Away*, FEDERAL TRADE COMMISSION IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited Apr. 10, 2023).

[27] *See Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, Report to Congressional Requesters, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737 (June 2007), available at https://www.gao.gov/assets/gao-07-737.pdf.

[28] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (2018), available at https://www.ssa.gov/pubs/EN-05-10064.pdf.

[29] *Id.* at 4.

paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

121.   According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016 – the same as a Facebook account.[31] But that pales in comparison with the asking price for medical data, which was selling for $50 and up.[32]

### L.   *Defendant's Failures*

122.   Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.   Failing to adequately protect customers' Private Information;

c.   Failing to properly monitor its own data security systems for existing intrusions;

d.   Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

---

[30] Brian Naylor, *Victims of Social Security Number Theft Find it's Hard to Bounce Back*, NPR (Feb. 9, 2015, 4:59 AM), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Apr. 10, 2023).
[31] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, BLOGDOG (Feb. 14, 2016) https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last visited Apr. 10, 2023).

[32] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, NAKED SECURITY (Oct. 3, 2019) https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited Apr. 10, 2023).

e.      Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f.      Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.      Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.      Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.      Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.      Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

m.      Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.      Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o.      Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p.      Failing to adhere to industry standards for cybersecurity as discussed above; and

q.      Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

123.    Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access ARcare's computer network and systems which contained unsecured and unencrypted Private Information.

124.    Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendant.

## M.    *Common Injuries & Damages*

125.    To date, Defendant has done absolutely nothing to provide Plaintiffs and the Class Members with actual relief for the damages they have suffered as a result of the Data Breach.

126.    Defendant has merely offered Plaintiffs and Class Members complimentary fraud and identity monitoring services for a short time, but this does nothing to compensate them for damages incurred and time spent dealing with the Data Breach.

127.     Plaintiffs' names, dates of birth, Social Security numbers, medical treatment information, prescription information, medical diagnosis or condition information, and health information were all compromised in the Data Breach and are now in the hands of the cybercriminals who accessed Defendant's computer system.

128.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) nominal damages; (j) future costs for credit and identity (medical and financial) theft monitoring services; and (j) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

129.     Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

36

a.      Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.      Purchasing credit monitoring and identity theft prevention;

c.      Placing "freezes" and "alerts" with reporting agencies;

d.      Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.      Contacting financial institutions and closing or modifying financial accounts; and,

f.      Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

130.     Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

131.     Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

132.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an imminent and ongoing risk of future harm.

   **N.    *The Risk of Identity Theft to Plaintiffs and Class Members Is Imminent and Ongoing***

37

133.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

134.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

135.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or Private Information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

136.     The Dark Web is an unindexed layer of the internet that requires special software or authentication to access.[33] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's

---

[33]  Louis DeNicola, *What Is the Dark Web?*, EXPERIAN (May 12, 2021) https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[34] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

137.    A sophisticated black market exists on the Dark Web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[35] The digital character of PII and PHI stolen in data breaches lends itself to Dark Web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[36] As Microsoft warns "[t]he anonymity of the Dark Web lends itself well to those who would seek to do financial harm to others."[37]

138.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name,

---

[34] *Id.*

[35] *What is the Dark Web?*, MICROSOFT 365 (Jul. 15, 2022) https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[36] *Id.*; Louis DeNicola, *What Is the Dark Web?*, EXPERIAN (May 12, 2021) https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[37] Louis DeNicola, *What Is the Dark Web?*, EXPERIAN (May 12, 2021) https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

and may even give the victim's Private Information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[38]

139.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[39]

140.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

141.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

142.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant against unauthorized data

---

[38] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (2018), available at https://www.ssa.gov/pubs/EN-05-10064.pdf.

[39] *See 2019 Internet Crime Report Released*, FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Apr. 10, 2023).

use for years or even decades to come.

143.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[40]

144.     Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### O.     *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

145.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

146.     Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendant's Data Breach Notice instructs them to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity

---

[40] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009) available at http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

on a regular basis."

147.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

148.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released the GAO Report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

149.    Plaintiffs' mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

150.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released the GAO Report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43] Indeed, the FTC

---

[41] *See Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, Report to Congressional Requesters, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737 (June 2007), available at https://www.gao.gov/assets/gao-07-737.pdf.
[42] *See What to do Right Away*, FEDERAL TRADE COMMISSION IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited Apr. 10, 2023).

recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

### P.   *Diminution of Value of the Private Information*

151.         Private Information is a valuable property right.[45] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

152.         Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[46]

153.         An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[47] In fact, the data

---

[43] *See Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, Report to Congressional Requesters, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737 (June 2007), available at https://www.gao.gov/assets/gao-07-737.pdf.

[44] *See What to do Right Away*, FEDERAL TRADE COMMISSION IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited Apr. 10, 2023).

[45] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[46] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Apr. 10, 2023).

[47] David Lazarus, *Column: Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, LOS ANGELES TIMES (Nov. 5, 2019, 5:00A M) https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Apr. 10, 2023).

marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[49]

154.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its unauthorized release onto the Dark Web, where it is now available and holds significant value for the threat actors. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

### Q.     Future Cost of Credit and Identify Theft Monitoring Is Reasonable, Necessary & a Foreseeable Consequence

155.     To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach — Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the foreseeable future. Defendant has not offered any other relief or protection.

156.     The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing

---

[48] *See* Datacoup Homepage, https://datacoup.com/ (last visited Apr. 10, 2023); Digi.me Homepage, https://digi.me/ (last visited Apr. 10, 2023).

[49] NIELSEN          COMPUTER          &          MOBILE          PANEL, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing (last visited Apr. 10, 2023).

identity theft and financial fraud. Defendant also places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

157.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, reports of misuse of Class Member Private Information discussed above, and reports of dissemination on the Dark Web also discussed above, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

158.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

159.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[50] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

---

[50] *See* Jesse Damiani, *Your Social Security Number Costs $4 On the Dark Web, New Report Finds*, FORBES (Mar. 25, 2020, 1:23 PM), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

160.     Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.  The necessity of protection for the impacted individuals is a foreseeable consequence of this type of data breach.

161.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### R.     Loss of Benefit of the Bargain

162.     Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant for its educational services and/or agreeing to work for Defendant, under certain terms, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## VI. CLASS ACTION ALLEGATIONS

163.     Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to Rule(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

164.     Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

46

All persons ARcare identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class").

165.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

166.     Plaintiffs reserve the right to amend or modify the Class or Subclass definitions as this case progresses.

167.     <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consist of approximately 345,353 patients/consumers of ARcare whose sensitive data was compromised in Data Breach.

168.     <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d.      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.      Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.      Whether Defendant should have discovered the Data Breach sooner;

i.      Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      Whether Defendant's conduct was negligent;

k.      Whether Defendant breach implied contracts with Plaintiffs and Class Members;

l.      Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m.      Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

n.      Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

169.	<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

170.	<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

171.	<u>Predominance</u>. Fed. R. Civ. P. 23(b)(3): Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

172.	<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

173.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

174.     Additionally, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether AR owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.     Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, andsafeguarding their Private Information;

c.     Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.     Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

e.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f.     Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and,

g.     Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## VII.    CAUSES OF ACTION

### FIRST COUNT
### Negligence
### (On Behalf of Plaintiffs and the Class)

175.    Plaintiffs re-allege and incorporate paragraphs 1-147 the Complaint as if fully set forth herein.

176.    Defendant required patients, including Plaintiffs and Class Members, to submit Private Information and allow Defendant to collect additional Private Information in the ordinary course of rendering healthcare services.

177.    By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

178.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

179.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its customers, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

51

180.	Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

181.	In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

182.	Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiffs and Members of the Class due to the valuable nature of the Private Information at issue in this case—including Social Security numbers.

183.	Plaintiffs and members of the Class are within the class of persons that the FTC Act was intended to protect.

184.	The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of failures to employ reasonable data security measures and avoid

unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

185.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

186.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.      Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.      Failing to adequately monitor the security of its networks and systems;

c.      Failing to ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.      Failing to have in place mitigation policies and procedures;

e.      Allowing unauthorized access to Class Members' Private Information;

f.      Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.      Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

187.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

188.         It was therefore foreseeable that the failure to adequately safeguard Class

Members' Private Information would result in one or more types of injuries to Class Members.

189.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

Members have suffered and will suffer injury, including but not limited to: (i) actual identity

theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise,

publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with

the prevention, detection, and recovery from identity theft, and/or unauthorized use of their

Private Information; (v) lost opportunity costs associated with effort expended and the loss of

productivity addressing and attempting to mitigate the actual and future consequences of the

Data Breach, including but not limited to efforts spent researching how to prevent, detect,

contest, and recover from identity theft; (vi) the continued risk to their Private Information,

which remain in Defendant's possession and is subject to further unauthorized disclosures so

long as Defendant fail to undertake appropriate and adequate measures to protect Private

Information in their continued possession; and (vii) future costs in terms of time, effort, and

money that will be expended to prevent, detect, contest, and repair the impact of the Private

Information compromised as a result of the Data Breach for the remainder of the lives of

Plaintiffs and Class Members.

190.         Plaintiffs and Class Members have suffered and are entitled to past and

future compensatory, consequential and nominal damages suffered as a result of the Data

Breach.

191.         Plaintiffs and Class Members are also entitled to injunctive relief requiring

Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**Breach of Implied Contract**
**(On behalf of the Plaintiffs and the Class)**

192.     Plaintiffs re-allege and incorporate by reference paragraphs 1-147 in the Complaint as if fully set forth herein.

193.     Plaintiffs and the Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

194.     Plaintiffs and the Class were required to and delivered their Private Information to Defendant as part of the process of obtaining services provided by Defendant. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services.

195.     Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services or Plaintiffs and Class Members.

196.     In accepting such information and payment for services, Plaintiffs and the other Class Members entered into an implied contract with Defendant whereby Defendant became obligated to reasonably safeguard Plaintiffs' and the other Class Members' Private Information.

197.     In delivering their Private Information to Defendant and paying for healthcare services, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

198.       In their written policies and registration form, Defendant expressly and impliedly promised to Plaintiffs and Class Members that it would only disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

199.       The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

200.       The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7)  other steps to protect against foreseeable data breaches.

201.       Plaintiffs and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

202.       Had Defendant disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and the other Class Members would not have provided their Private Information to Defendant.

203.     Defendant recognized that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and the other Class Members.

204.     Plaintiffs and the other Class Members fully performed their obligations under the implied contracts with Defendant.

205.     Defendant breached the implied contract with Plaintiffs and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

206.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

207.        As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and are entitled to past and future compensatory and consequential damages as a result of the Data Breach.

208.        Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**THIRD COUNT**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

209.    Plaintiffs re-allege and incorporate by reference paragraphs 1-147 of the Complaint as if fully set forth herein.

210.    This count is pleaded in the alternative to Count 2 (breach of implied contract).

211.    Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant money for healthcare services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' Private Information, and by providing Defendant with their valuable Private Information.

212.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

213. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

214. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

215. If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

216. Plaintiffs and Class Members have no adequate remedy at law.

217. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private

Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

218.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

219.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## FOURTH COUNT
### Breach of Fiduciary Duty
### (On Behalf of Plaintiffs and the Class)

220.    Plaintiffs repeat and re-allege paragraphs 1-147 of the Complaint as if fully set forth herein.

221.    In providing their Private Information to Defendant, Plaintiffs and Class Members justifiably placed a special trust in Defendant to act in good faith and with due regard for the interests of Plaintiffs and Class Members to safeguard and keep confidential their Private Information.

222.    Defendant accepted the trust Plaintiffs and Class Members placed in it, as evidenced by its acknowledgment that it had a duty to protect Plaintiffs' and Class Members Private Information.

223.    In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardians of Plaintiffs and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, customers, and employees, including

Plaintiffs and Class Members (1) for the safeguarding of Plaintiffs' and Class Members' Private Information for the safeguarding of Plaintiffs and Class Members' Private Information.

224.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients to keep secure their Private Information.

225.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

226.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt or otherwise protect the integrity of the systems containing Plaintiffs and Class Members' Private Information.

227.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

228.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

229.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

230.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of

productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information  in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

231.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and are entitled to past and future compensatory and consequential and nominal damages as a result of the Data Breach.

232.     Moreover, Plaintiffs' and Class Members' Private Information remains at risk, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

233.     Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## FIFTH COUNT
### Declaratory Judgment/Injunctive Relief
### (On Behalf of Plaintiffs and the Class)

234.     Plaintiffs re-allege and incorporate by reference paragraphs 1-147 of the Complaint as if fully set forth herein.

235.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

236.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from future data breaches that compromise their Private Information. Plaintiffs and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

237.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect employee and patient Private Information.

238.    Defendant still possesses the Private Information of Plaintiffs and the Class.

239.    To Plaintiffs' knowledge, Defendant has made no announcement that it has changed its data storage or security practices relating to the Private Information.

240.    To Plaintiffs' knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

241.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at ARcare. The risk of another such breach is real, immediate, and substantial.

242.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at ARcare, Plaintiffs and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

243.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at ARcare, thus eliminating the additional injuries that would result to Plaintiffs and Class Members, along with other patients and/or current and former ARcare employees whose Private Information would be further compromised.

244.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that ARcare implement and maintain reasonable security measures, including but not limited to the following:

245.    Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on ARcare's systems on a periodic basis, and ordering ARcare to promptly correct any problems or issues detected by such third-party security auditors;

a.    engaging third-party security auditors and internal personnel to run automated security monitoring;

b.    auditing, testing, and training its security personnel regarding any new or modified procedures;

64

c.      purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

d.      conducting regular database scans and security checks; and

e.      routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VIII.      **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Greg Hale, Alicia Gilmore, Michael Whitkanack, and Jessica White pray for judgment as follows:

A.      For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.      For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.      prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.      requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.    requiring Defendant to delete, destroy, and purge the Private Information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and securing checks;

xi.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.      requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.      requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting Private Information;

xiv.      requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.      requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.      requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such

report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to patient and consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

E.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F.      Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

G.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.      For an award of punitive damages, as allowable by law;

I.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.      Pre- and post-judgment interest on any amounts awarded; and,

K.      Such other and further relief as this court may deem just and proper.

## IX. JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: 6/2/2023

Respectfully Submitted,

_____
Josh Sanford
Ark. Bar No. 2001037
**SANFORD LAW FIRM, PLLC**
Kirkpatrick Plaza
10800 Financial Centre. Pkwy., Ste. 510
Little Rock, Arkansas, 72211
Phone: (501) 221-0088
Fax: (888) 787-2040
*Josh@sanfordlawfirm.com*

*Interim Liaison Counsel*

Bryan L. Bleichner (admitted *pro hac vice*)
Philip J. Krzeski (*pro hac vice* forthcoming)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Jean Martin (admitted *pro hac vice*)
Francesca Kester Burne (admitted *pro hac vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, Florida 33602
Phone: (813) 559-4908
Jean.martin@forthepeople.com
fkester@forthepeople.com

*Interim Lead Counsel*

Joseph M. Lyon *(admitted pro hac vice)*
**THE LYON FIRM, LLC**
2754 Erie Avenue
Cincinnati, OH 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
Email: *jlyon@thelyonfirm.com*

Terence R. Coates (*pro hac vice* forthcoming)
**MARKOVITS, STOCK & DEMARCO, LLC**

69

119 E. Court Street
Cincinnati, OH 45202
Phone: (513) 651-3700
*tcoates@msdlegal.com*

Gary M. Klinger (*admitted pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

Christopher D. Jennings (Ark. Bar No. 2006306)
Nathan I. Reiter III (Ark Bar No. 202125)
**JOHNSON FIRM**
610 President Clinton Ave., Ste. 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
*chris@yourattorney.com*
*nathan@yourattorney.com*

William B. Federman
(*pro hac vice* application forthcoming)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Phone: (405) 235-1560
*wbf@federmanlaw.com*

Nicholas A. Migliaccio (*pro hac vice* forthcoming)
Jason Rathod (*pro hac vice* forthcoming)
Kevin Leddy (*pro hac vice* forthcoming)
**MIGLACCIO & RATHOD, LLP**
412 H. Street NE
Washington, D.C. 20002
Phone: 202-470-3520
*nmiglaccio@classlawdc.com*

Joseph Gates (Ark. Bar No. 2010239)
**GATES LAW FIRM, PLLC**
6020 Ranch Blvd., Ste. C-4, Office #3
Little Rock, AR 72223
Phone: (501) 779-8091
*Gates@gateslawpllc.com*

***Counsel for Plaintiffs and the Proposed Class***