**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **GREG HALE, ALICIA GILMORE,** | * | |
| **MICHAEL WHITKANACK, AND** | * | |
| **JESSICA WHITE, on behalf of themselves** | * | |
| **and all others similarly situated,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | No. 3:22-CV-117 BSM |
| | * | |
| **ARCARE, INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | *********** | |

## UNITED STATES' STATEMENT OF INTEREST IN OPPOSITION TO DEFENDANT ARCARE'S MOTION TO SUBSTITUTE

Founded in 1986, ARcare, Inc., ("ARcare") is a private corporation run by a private board of directors that operates dozens of health care clinics primarily in Arkansas but also in Kentucky and Mississippi.  In 2021, ARcare reported more than $139 million in total revenue, with less than 15% of that revenue coming from grants issued by the Health Center Program of the United States Department of Health and Human Services.[1]  In April 2022, ARcare announced that it had experienced a "data security incident," in which unauthorized persons broke into its computer network and stole information on potentially hundreds of thousands of its patients.  This data breach prompted the filing of several class-action lawsuits against ARcare in state and federal courts in Arkansas alleging claims under state law.  These lawsuits have since been consolidated in front of this Court.

_____

[1] *See* ProPublica Nonprofit Explorer, ARcare, Inc., https://projects.propublica.org/ nonprofits/organizations/581666179 (2021 audit documents).

Because ARcare receives some federal grant funding, ARcare contends that this Court should force the substitution of United States as a defendant in ARcare's place under the Federally Supported Health Centers Assistance Act ("FSHCAA"), and the American taxpayer should pay for the defense of this action and any potential judgment or settlement. ARcare's contentions are meritless. Nothing in the FSHCAA authorizes federal courts to compel the United States substituted as the defendant in place of a health center, even if the health center might be immune from suit under 42 U.S.C. § 233(a). And regardless, ARcare is not immune from data-breach claims. For these reasons and as further detailed below, ARcare's Motion to Substitute the United States or, in the Alternative, Motion to Dismiss must be denied.[2] Dkt. Nos. 25, 26.

# I.    BACKGROUND

## A.    Federally Supported Health Centers

The federal government provides grants to public and private nonprofit entities to defray "the costs of the operation of public and nonprofit private health centers that provide health services to medically underserved populations." 42 U.S.C. § 254b(1)(A).[3] Before 1992, health centers used their own funds, including grant money, to purchase medical malpractice insurance. H.R. Rep. 102-823, at 5 (1992). To help ease this burden and to preserve grant money for

---

[2] The United States, although not a party to the case, submits this Statement of Interest in Opposition to ARcare's Motion to Substitute pursuant to the Court's invitation, Dkt. No. 33. 28 U.S.C. § 517.

[3] A federal grant is "financial assistance authorized by federal law to support autonomous programs of states or local governments or groups, which the federal government does not dictate but does wish to encourage. . . . Grants are characterized by a 'maximum of autonomy in the program essentials, coupled with a necessary minimum of fiscal control to assure integrity.'" *See Samish Indian Nation v. United States*, 90 Fed. Cl. 122, 131 (2009) (citations omitted), *aff'd in part, rev'd on other grounds,* 657 F.2d 1330 (Fed. Cir. 2011) *cert. granted, judgment vacated in part*, 568 U.S. 936 (2012).

patient care, Congress passed the Federally Supported Health Centers Assistance Act of 1992,

Pub. L. No. 102-501, 106 Stat. 3268 (1992) ("FSHCAA"). *See* H.R. Rep. 102-823, at 6 (1992)

("Extending FTCA coverage to grantees . . . will enable them to redirect funds now spent on

medical malpractice insurance premiums[.]").  This act was grafted onto an earlier statute

enacted in 1970 immunizing United States Public Health Service ("PHS") employees from

medical malpractice.[4]  Subject to statutory conditions and limitations, the FSHCAA made the

remedy of the Federal Tort Claims Act ("FTCA"), *codified at* 28 U.S.C. §§ 2671-80, against the

United States exclusive for certain medical malpractice suits.  H.R. Rep. 102-823, at 4-6 (1992).

Following a three-year demonstration period, Congress amended the FSHCAA to clarify the

scope of malpractice protections afforded under the statute and to make the FSHCAA's

malpractice protections optional for qualifying grantees. *See* Pub. Law No. 104-73, §§ 2-11,

*codified as amended at* 42 U.S.C. § 233(g)-(n).

Should a health center decide to seek eligibility for medical malpractice protections under

the FSHCAA, it must apply to the Secretary of Health and Human Services ("HHS"), meet

certain requirements, and obtain annual approval from the Secretary.  42 U.S.C. §§ 233(g)(1)(A)-

(D), (h).  If the health center is approved, the Secretary "deems" the health center and its

providers to be employees of the PHS for the upcoming calendar year, but only "with respect to

services provided" to its patients and certain non-patients in specified pre-approved

circumstances, and only "[f]or purposes of" 42 U.S.C. § 233.  42 U.S.C. § 233(g)(1)(A), (B)-(C).

---

[4] The Surgeon General asked Congress to enact this statutory immunity because PHS officers and
employees could not afford to purchase medical malpractice insurance, and federal common-law official
immunity afforded no protection against medical malpractice claims.  116 Cong. Rec. 42,543 (1970);
*Henderson v. Bluemink*, 511 F.2d 399, 402-03 (D.C. Cir. 1974).  The FSHCAA, by "deeming" qualifying
entities and individuals to be PHS employees only for "purpose of [section 233]" incorporates only the
immunity afforded under 42 U.S.C. § 233(a), not the broader immunity conferred under the Westfall Act,
28 U.S.C. § 2679(b)(1).

Thus, a health center's deemed status applies only to the provision to patients (and some non-patients) of certain primary and additional health services, which are enumerated at 42 U.S.C. § 254b(b)(1) and (2).   42 U.S.C. § 233(g)(1)(b).  When health centers apply for grant funding, they are required to identify in Form 5A of the grant application which of these § 254b services that they intend to provide to patients and certain non-patients.[5]  *See* Form 5A, Excerpt from ARcare's Grant Application, Ex. 1.  Notably, cybersecurity activities do not constitute the provision of any service under § 254b or 42 U.S.C. § 233(g)(1)(B) and are not identified in Form 5A of ARcare's grant application.  Once a deeming application is approved, it is conclusive as to "the provision of services which are the subject of such a determination."  42 U.S.C. § 233(g)(1)(F).

Thus, the deeming determination is akin to a private medical malpractice insurance policy that circumscribes the insurable risks.[6]  Just like under private medical malpractice insurance policies, each lawsuit must be evaluated to determine whether coverage applies.  For health centers that have received deeming determinations and are now seeking FTCA coverage, the terms of the approved grant application, and the services approved therein, set the parameters of an entity's deeming in the first instance, subject to further analysis as to whether the activities fit the scope of § 233(a) immunity and then whether the activities were within the deemed entity/provider's scope of employment.  Only by analyzing a plaintiff's complaint through all

---

[5] *See* HHS, Health Resources & Services Administration (HRSA), Bureau of Primary Health Care (BPHC), "Service Descriptors for Form 5A: Services Provided," https://bphc.hrsa.gov/sites/default/files/bphc/compliance/form-5a-service-descriptors.pdf, last visited November 28, 2023.

[6] In its letters including the Notice of Deeming Action ("NDA") for each relevant year, HHS alerted ARcare that the NDA was "confirmation of medical malpractice coverage for both ARcare and its covered individuals[.]" Letter from HRSA (HHS) to Steven F. Collier (ARcare), Dkt. 25-1, pages 3, 5, 7.

three steps can FTCA coverage be determined, and, if the health center/provider does not meet

any of these steps, it is fatal to their claim to coverage.

Consistent with the limits of FTCA coverage afforded under the FSHCAA, HHS has

warned these "deemed" health centers that they still need to seek private insurance policies for

all other contingencies, including for theft.  *See* Federal Tort Claims Act Health Center Policy

Manual (July 21, 2014 ed.), H.4 ("FTCA provides protection only for personal injury, including

death, resulting from the performance of medical, surgical, dental, or related functions, which

constitute medical malpractice for purposes of this Manual.  Consequently, *even with FTCA*

*coverage, covered entities will continue to need other types of insurance, such as* non-

medical/dental professional liability coverage, general liability coverage, director's and officer's

liability coverage, automobile and collision coverage, fire coverage, and *theft coverage*."),

*available at* https://bphc.hrsa.gov/sites/default/files/bphc/technical-assistance/ftcahc-policy-

manual.pdf (emphasis added).

### B.   Current Litigation Based on ARcare's "Data Security Incident"

On or around February 24, 2022, ARcare learned that unauthorized persons broke into its

computer network and stole patient information.  Consolidated Class Action Compl., at ¶¶ 26-29,

Dkt. No. 19.  ARcare notified its patients about the "data security incident" on or around April

25, 2022.  *See id.*; *see* ARcare, Inc., "Notice of Data Privacy Incident" ("ARcare experienced a

data security incident that impacted its computer systems and caused a temporary disruption to

services.  ARcare immediately worked to secure its systems and quickly commenced an

investigation to confirm the nature and scope of the incident.").[7]  There are potentially 345,353

patients whose information was stolen from ARcare.  Consolidated Class Action Compl. at ¶ 2.

---

[7] *Available at* https://www.arcare.net/wp-content/themes/altitude-pro/security_notice.html.

On May 10, 2022, six separate plaintiff groups began filing putative class actions against ARcare alleging various state law claims arising from the data breach:

- *Hale v. ARcare, Inc.*, No. 22-cv-117 (E.D. Ark. May 10, 2022);
- *Engles v. ARcare, Inc.*, No. cv-22-43 (Ark. Cir. Ct. May 10, 2022)[8];
- *White v. ARcare, Inc.*, No. 22-cv-454 (E.D. Ark. May 16, 2022);
- *Gilmore v. ARcare, Inc.*, No. 22-cv-123 (E.D. Ark. May 19, 2022);
- *Whitkanack v. ARcare, Inc.*, No. cv-22-46 (Ark. Cir. Ct. May 19, 2022)[9];
- *Johnson v. ARcare, Inc.*, No. 22-cv-571 (E.D. Ark. June 17, 2022).

On May 26, 2022, ARcare requested representation from HHS for the first five cases (*Hale*, *Engles*, *White*, *Gilmore*, and *Whitkanack*). Letter from W. Moore (ARcare) to HHS (May 26, 2022), Ex. 2. To date, ARcare has not requested representation for *Johnson*.

All six actions were consolidated into this case by Order of March 1, 2023. Dkt. No. 17. Plaintiffs filed their Consolidated Class Action Complaint against ARcare on June 2, 2023. Dkt. No. 19. The Engles family and Ms. Johnson are no longer listed as plaintiffs in the caption of the new Complaint. No medical providers are named as defendants.

In their Consolidated Class Action Complaint, Plaintiffs seek money damages, restitution, and injunctive relief for Class members based on four causes of action: negligence; breach of implied contract; unjust enrichment; and breach of fiduciary duty. Plaintiffs allege that ARcare owed a duty of care to them to "use reasonable means to secure and safeguard its

---

[8] Removed from Arkansas state court on June 13, 2022, Case No. 3:22-cv-139 (E.D. Ark.). Plaintiff moved to remand, Dkt. Nos. 17, 18, which was denied on March 28, 2023. Order, Dkt. No. 55. The United States does not contest that removal was proper under 42 U.S.C. § 233(*l*)(2) because the Attorney General did not appear in state court within 15 days of receiving notice of the lawsuit. The United States also notes that the Court did not reach a conclusion in its Order whether ARcare is a deemed Public Health Service employee for purposes of the acts and omissions Plaintiffs allege.

[9] Removed from Arkansas state court on June 13, 2022, Case No. 3:22-cv-140 (E.D. Ark.).

computer systems – and Class Members' Private Information held within it – to prevent disclosure of the information, and to safeguard the information from theft." *Id.* at ¶ 177. Moreover, Plaintiffs allege that the duty of care included "provid[ing] data security consistent with industry standards . . . to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information." *Id.* at ¶ 178. No medical providers are alleged to have committed medical malpractice or breached professional standards of conduct owed in treating, diagnosing, or curing any patient. Plaintiffs did not serve the Consolidated Class Action Complaint on the United States. *See* Fed. R. Civ. P. 4(i)(1).

ARcare requested a motion to stay its responsive pleading deadline on July 11, 2023, pursuant to 42 U.S.C. § 233(*l*)(2).[10] Dkt. Nos. 23, 24. On July 26, 2023, ARcare then filed a motion to substitute the United States, or, in the alternative, motion to dismiss. Dkt. Nos. 25, 26; (*hereinafter* "Mot. to Substitute"). Plaintiffs did not respond within the opposition deadline. ARcare did not serve this motion to substitute on the United States. *See* Fed. R. Civ. P. 4(i)(1).

---

[10] ARcare's invocation of 42 U.S.C. § 233(*l*)(2) was procedurally improper in this setting for several reasons. ARcare never invoked that statute, nor could it, in four of the six plaintiff groups because these four cases were filed directly into federal court and § 233(*l*)(2) is a removal provision. Of the remaining two plaintiff groups in which this subsection was properly invoked in state court, one plaintiff group (*Engles*) is no longer named in the case caption. Moreover, while the *Engles* and *Whitkanack* cases were removed pursuant to this subsection, those plaintiffs later acquiesced to federal court jurisdiction when they joined the consolidated class action complaint and averred that this Court had jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This Consolidated Class Action Complaint amends and thus supersedes the previous six separate complaints, nullifying the state court complaints upon which removal under § 233(*l*)(2) had been invoked. *See Wullschleger v. Royal Canin U.S.A., Inc.*, 75 F.4th 918, 923 (8th Cir. 2023) (approving plaintiff "switch[ing ] jurisdictional horses" in an amended complaint) (quoting *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 92 (1st Cir. 2008)). Finally, now that this case is firmly in federal court, the need for § 233(*l*)(2) to protect ARcare against any default judgment in state court has evaporated. *See El Rio Santa Cruz Neigh'd Health Ctr., Inc. v. U.S. Dep't of Health & Human Svcs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005) (observing that purpose of a (*l*)(2) removal is to "protect a covered defendant against a default judgment due to the Attorney General's untimeliness").

The United States learned of this pending motion by checking the docket and, given the improper relief sought, filed a Notice with this Court.  Notice, Dkt. No. 27.  In its Notice, the United States observed that, because Plaintiffs had not opposed the motion to dismiss, that motion could be granted.  The United States also offered to submit a Statement of Interest at the Court's invitation to explain its position as to ARcare's Motion to Substitute.

Given the pending motion to substitute, the United States denied ARcare's request that the United States assume defense of the suits – including *Johnson*, though ARcare had not yet submitted a request yet, and though the posture had changed now that these cases were consolidated.  The letter denied ARcare's request for FTCA coverage because data-breach claims are not claims "for damage for personal injury, including death, resulting from the performance of medical surgical, dental, or related functions.'"  Letter from J. Ross (USAO) to M. Freedus (Feldesman Tucker) (Sept. 18, 2023) (quoting 42 U.S.C. § 233(a)), Ex. 3.

In a motion styled, "Brief in Response to Automatic Stay of 42 U.S.C. § 233(*l*)(2)," ARcare "responded" to the United States' Notice.  Dkt. No. 29 (*hereinafter* "Automatic Stay Br.").  In this seven-page pleading, ARcare offered two arguments: (1) that, service of process had been effectuated via 42 U.S.C. § 233(b); and (2) that there is statutory authority for the substitution of the United States, without citing an applicable statutory provision conferring that authority. *Id.*

On October 31, 2023, this Court invited the United States to submit a statement of interest by November 30, 2023.  Dkt. No. 33.

## II.    ARGUMENT

### A.    No Statute Authorizes This Court to Force the United States to Take ARcare's Place as the Defendant in This Lawsuit.

ARcare asks this Court to force the United States to take ARcare's place as the defendant because it is "not only proper but required by statute." ARcare then cites no statute authorizing such action. [11] *See generally* Dkt. Nos. 25-26.   It is well established, however, that the lower federal courts "are creatures of statute, and they have only so much of the judicial power of the United States as the acts of Congress have conferred upon them." *Bath County v. Amy*, 80 U.S. 244, 247-48 (1871).  As ARcare fails to identify a statute in which Congress authorizes district courts to force the substitution of the United States for a health center, its motion to substitute the United States must be denied. [12]

### 1.    Forced substitution is not authorized under any provision of 42 U.S.C. § 233.

Section 233(a) of Title 42 of the United States Code makes an FTCA claim against the United States the exclusive remedy for medical-malpractice actions against health centers and their providers who are "deemed" to be PHS employees. *See* 42 U.S.C. § 233(a), (g); H.R. Rep. 102-823, at 4 (1992).  Section 233(a) thus provides a potential immunity defense for such defendants. *See, e.g., Hui v. Castaneda*, 559 U.S. 799, 802, 811 (2010) (holding that PHS

---

[11] Indeed, "substitute" is not mentioned in the FSHCAA. "Substitute," however, is in a different part of the statute: 42 U.S.C. § 233(p)(5)(B).  In subsection (p), the United States may be substituted out for a covered person who administered the smallpox vaccine when that covered person does not cooperate with the United States in its defense of the case.  Moreover, as explained *infra.*, Congress has, in another statute, created a statutory action through which substitution of the United States can be sought. *See* 28 U.S.C. § 2679(d)(3).  That statutory provision is not applicable to ARcare because it is "deemed" a PHS employee only for purposes of 42 U.S.C. § 233.

[12] Forced substitution, of course, is different than an entity seeking dismissal because a statute directs that a plaintiff's exclusive remedy is against someone else.  The United States does not contest ARcare's ability to seek dismissal under 42 U.S.C. § 233(a) – no matter how much it may disagree with the merits of its defense. *See* Section II.C.

employees were immune to claims alleging deliberate indifference to a patient's serious medical needs because the alleged misconduct fell within § 233(a)).

Nothing in the FSHCAA, however, alters the black letter principle that "the plaintiff is the master of the complaint[.]" *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (quotation and citation omitted). Instead, if plaintiff files her action in state court against a deemed center/provider, Congress provided the Attorney General with authority to intervene and remove actions upon issuing a "scope certification" while leaving the plaintiff the right to move for remand. 42 U.S.C. § 233(c). If the Attorney General declines to take action, a health center or other "deemed" provider may assert immunity under § 233(a), and a plaintiff is free to pursue his or her claim instead against the United States under the FTCA – subject to any defenses the United States may assert. Likewise, if the United States asserts that the health center/provider is not covered by the FTCA pursuant to 42 U.S.C. § 233(a), that plaintiff is free to pursue his or her claim against the center/provider directly – subject to any defenses the center/provider may assert. But no provision of § 233 authorizes a federal court to disrupt plaintiff's control over the complaint by forcing the United States to be substituted in place of a defendant in an existing lawsuit or vice versa. *See United States v. Great N. Ry. Co.*, 343 U.S. 562, 575 (1952) ("It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written.").

    a.    *The history of § 233(a) confirms that the plaintiff remains the master of the complaint.*

Congress passed § 233(a) in 1970 and modeled it after the Federal Drivers Act of 1961, which "made an action against the United States under the FTCA the 'exclusive' remedy for 'personal injury . . . resulting from the operation by any employee of the Government of any

motor vehicle while acting within the scope of his office or employment.'" *Levin v. United States*, 568 U.S. 503, 508 n.2 (2013).

The Drivers Act contained no provision governing what should occur when an employee-defendant asked the Attorney General to intervene and the Attorney General refused.  When that circumstance arose, courts interpreting the Federal Drivers Act held that it did not allow federal courts to force the United States to substitute as a defendant.  *See, e.g., Seiden v. United States*, 537 F.2d 867, 869-70 (6th Cir. 1976) (citing *Proietti v. Levi*, 530 F.2d 836 (9th Cir. 1976); *Lemley v. Mitchell*, 304 F. Supp. 1271 (D.D.C. 1969)).  Instead, federal employees could attempt to prove their claimed statutory immunity—in whatever court they were in—to seek dismissal of the case.[13]  *See id.*; *Sangeminio v. Zuckerberg*, 454 F. Supp. 206, 208-09 (E.D.N.Y. 1978) (noting that "the failure (or even refusal) of the Attorney General to supply an appropriate certification will not preclude a defendant driver from invoking the personal immunity of the Federal Drivers Act in defense of such an action"); *Fancher v. Baker*, 240 Ark. 288, 292-93 (1966) (affirming dismissal of claims against defendant federal employee driver who was immune under Federal Driver's Act); *Hope v. Berrett*, 756 P.2d 102 (Utah Ct. App. 1988) (affirming summary judgment

---

[13] This procedure is not unusual.  Indeed, Congress, in enacting the Drivers Act, pointed to two different statutes as precedent for making a remedy against the United States exclusive of any other action: the Suits in Admiralty Act ("SIAA") and the Patent Act.  *See* H.R. Rep. No. 297, at 4-5, 87th Cong. 1st Sess. (April 25, 1961).  Under both the SIAA and the Patent Act, a private defendant is free to raise the "exclusivity" provision as a defense to obtain dismissal—in state or federal court—and a plaintiff remains free to challenge the asserted defense.  Dismissal, not substitution of the United States, is what occurs if the defendant prevails, with the plaintiff having the option of pursuing appeal or filing a new action.  *See, e.g., Williams v. Cent. Gulf Lines*, 874 F.2d 1058 (5th Cir. 1989) (SIAA raised as defense in federal court); *Robinson v. Amer. Overseas Marine*, 422 S.W.3d 1 (Tex. Ct. App. 1st Dist. 2012) (SIAA raised as defense in state court); *LaChappelle v. Interocean Mgmt. Corp.*, 731 A.2d 163 (Pa. Sup. Ct. 1999) (SIAA raised as defense in state court); *Madey v. Duke Univ.*, 413 F. Supp. 2d 601 (M.D.N.C. 2006) (Patent Act raised as defense in federal court); *Bunting v. McDonnell Aircraft Corp.*, 522 S.W.2d 161 (Mo. 1975) (Patent Act raised as defense in state court).

for defendant federal employee driver who was immune under Federal Driver's Act).  Compelled substitution of the United States was not an available remedy.

        **b.**    *Recent practice confirms that suit immunity can be tested early in the case by a health center's motion to dismiss.*

A recent example shows how the community health center can seek its own immunity when the United States refuses to intervene.  In *Lamoille v. Marshall*, plaintiff represented a purported class action about a community health center's data breach and filed her complaint directly in federal court.  *Marshall v. Lamoille Health Partners, Inc.*, No. 2:22-cv-166 (D. Vt.), *settled on appeal*, Case No. 23-800 (2d Cir.).  The community health center sought FTCA coverage, which the United States Attorney denied.  The community health center then moved to dismiss the case based on its claim to immunity under § 233(a).  (Like here, because the case was already in federal court, there was no predicate for an Attorney General certification under § 233(c).)

The court denied the motion to dismiss because the community health center was not immune.  *Marshall v. Lamoille Health Partners, Inc.*, No. 2:22-cv-166, 2023 WL 2931823, at *5 (D. Vt. Apr. 13, 2023) ("[T]he technology-specific allegations in this case do not include 'medical, dental, surgical, or related functions' as required for immunity under the FSHCAA[.]").  Thus, contrary to ARcare's position, no substitution (or certification) was available or needed for the community health center to assert its claims for suit immunity.

        **2.**    **Forced substitution is not authorized under 42 U.S.C. § 233(c).**

ARcare also appears to rely on § 233(c) to force the United States' substitution.  *See* Automatic Stay Br. at 5 ("§ 233 itself supplies the authority to order certification of a defendant and the substitution of the United States in her or her place.").  This provision is plainly inapposite.

Section 233(c) allows the United States to remove a case from state to federal court "[u]pon a certification by the Attorney General" that the action is covered by 42 U.S.C. § 233(a). Here, the Attorney General did not issue a certification or remove this case to federal court and now has stated its position that ARcare is not deemed for purposes of the allegations in Plaintiffs' Complaint.  Nothing in § 233(c) purports to authorize the compelled substitution of the United States under these (or any other) circumstances.

Any suggestion that this court can force the United States to issue a certification under 42 U.S.C. § 233(c) misunderstands the statutory scheme and Supreme Court precedent. Certification is not necessary to effect the *voluntary* substitution of the United States; instead, it is needed to pledge to the federal court that there is merit for removal from the court chosen by plaintiff.  *Hui*, 559 U.S. at 810-11; *Lemley v. Mitchell*, 304 F. Supp. 1271, 1273 (D.D.C. 1969) (Certification "was designed to facilitate removal to a federal court when it appeared that the United States would be the only proper party defendant.").[14]

Even without a "scope certification," which is only necessary to effectuate removal and has no effect on a case originally filed in federal court, the factual prerequisites for the *voluntary* substitution of the United States can be established by a declaration or evidence other than the Attorney General's certification.  *See Hui*, 559 U.S. at 811 (rejecting argument that PHS employees necessarily must rely upon "scope certification" to establish immunity in cases filed in federal court or that the United States cannot effect its substitution into the case through other

---

[14] Congress enacted the "scope certification" requirement by the Attorney General as an amendment to Drivers Act to "make[] certain that suits will not be removed improperly."  *See* 87 Cong. Rec. S18489, 18499 (daily ed. Sept. 7, 1961).  This amendment was necessary because a prior "Drivers Act" bill, H.R. 7577, which required a plaintiff's *consent* for removal to be effectuated, had been vetoed. House of Representatives, 86th Cong., 2d Sess., Doc. No. 415, "Message from the President of the United States Returning without Approval, the Bill (H.R. 7577)" (June 11, 1960).

means).  The United States' entrance into the case is then accomplished by a motion to intervene. *Cf. U.S. ex rel. Eisenstein v. City of New York, New York,* 556 U.S. 928, 933 (2009) ("[I]ntervention is the requisite method for a nonparty to become a party to a lawsuit [in federal court].").  *Hui* does not hold, let alone suggest, that 42 U.S.C. § 233(a) authorizes federal courts to force the United States to substitute in place of a defendant.  It addresses only the mechanisms through which an employee might assert his immunity or through which the United States might establish its basis for voluntary intervention or substitution in a case filed in federal court as opposed to state court.

### 3.    Forced substitution is not authorized under 42 U.S.C. § 233*(l)*(2).

Additionally, ARcare appears to rely on § 233(*l*)(2) to force the United States' substitution, but this subsection plainly does not authorize substitution.  *See* Mot. to Substitute at 4, 7, Dkt. No. 26; Automatic Stay Br. at 5, Dkt. No. 29.  This provision allows a health center or its providers to remove a case from state to federal court if the Attorney General fails to appear within 15 days after receiving notice of the action.  The federal court then may "conduct[] a hearing, and make[] a determination, as to the appropriate forum or procedure for the assertion of the claim for damages described in [§ 233(a)]."  The purpose of allowing a community health center to remove a case under § 233(*l*)(2) is only to "protect a covered defendant against a default judgment due to the Attorney General's untimeliness."  *El Rio Santa Cruz Neigh'd Health Ctr., Inc. v. U.S. Dep't of Health & Human Svcs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005). *See* HR Rep No. 104-398, 11-12 (discussing reason for (*l*)(2) removal: "Attorney General [was] responsible for securing removal to Federal Court[,]" but if his response was "not timely," "a default judgment against the defendant health center or individual could be filed").

Of course, now that all actions—including those which ARcare removed from state court under § 233(*l*)(2)—are consolidated into a single, superseding complaint, those original state court complaints and actions are no more.  Section 233(*l*)(2) is inapplicable on its face.  But even if § 233(*l*)(2) were somehow relevant at this juncture in the case, it does not assist ARcare's cause.[15]

Nowhere in the legislative history does Congress describe this subsection's purpose as giving a potentially covered defendant a right to challenge coverage decisions or to compel substitution of the United States.  Instead, when a case is properly removed pursuant to (*l*)(2), the federal court may "conduct a hearing" and may "make a determination" as to which forum plaintiff should assert her claim for damages described in § 233(a).  There are scenarios that could result from a hearing after an (*l*)(2) removal, but none of them lead to the *forced* substitution of the United States:

- If the United States believes that the center/provider is covered and that removal would have been proper under § 233(c), then the court has jurisdiction to grant the United States' voluntary intervention and substitution pursuant to the Federal Rules of Civil Procedure, or to grant a plaintiff's challenge to that substitution and order remand to state court.

- If the United States, on the other hand, advises that the United States will not intervene, as it would have advised the state court had the case remained there, then the mandatory predicate for removal—a scope certification under 233(c)— never would have issued, and no FTCA jurisdiction could have attached upon removal to federal court.[16]  At that point, unless some other basis for federal

---

[15] In this case, the lines are blurred between ARcare's request for an (*l*)(2) hearing (which arguably only applies to *Engles* and *Whitkanack*) and ARcare's motion to dismiss pursuant to its claim of § 233(a) immunity, which applies to the consolidated class action complaint.  As described earlier in footnote 10, the consolidated complaint with its claim of diversity jurisdiction under the Class Action Fairness Act supersedes ARcare's § 233(*l*)(2) removal in two of the cases and remand is no longer a solution here.  Regardless, ARcare's motion to dismiss based on § 233(a) immunity requires that this court determine whether ARcare's claim to immunity merits its dismissal.

[16] When a plaintiff files suit in state court against individual employees, it is not an FTCA suit. Federal jurisdiction under the FTCA lies "only after the Attorney General certifies . . . scope of employment.  The possibility that such a certification might issue does not automatically divest a state

jurisdiction at the time of removal can be identified, the proper course is to remand the case. Without jurisdiction, a federal court must announce that fact and remand, leaving the remaining parties to litigate the cause—and any putative defenses—in state court.

- Finally, if a federal court discerned a basis for sustaining its continued jurisdiction, the entity/provider could, as it could do it state court, put on its immunity defense to request dismissal.

In sum, no provision of § 233(*l*)(2) grants authority to compel the United States substituted. If Congress had intended such a remedy, it would have made that intent clear.

### 4. Congress can authorize and has authorized substitution of the United States by statute – but did not do so in § 233(a) or the FSHCAA.

Congress has written a statute in which a defendant can petition for the substitution of the United States, and it did so just four years before the FSHCAA became law. In the Westfall Act of 1988, Congress amended (and superseded) the Federal Drivers Act to allow federal employees, in the event the Attorney General refuses to issue a scope-of-employment certification, to petition a court "to find and certify that the employee was acting within the scope of his office or employment," and if the court so finds, "the United States shall be substituted as the party defendant." Pub. L. No. 100-694, § 6, 102 Stat. 4563, 4564–65 (1988), *codified at* 28 U.S.C. § 2679(d)(3). Critically, Congress did not amend 42 U.S.C. § 233 or include such provisions in the FSHCAA, and federal courts must "presume that such drafting decisions are deliberate." *United States v. Alexander*, 725 F.3d 1117, 1121 (9th Cir. 2013) (noting that "it is

---

court of jurisdiction." *Thompson v. Wheeler*, 898 F.2d 406, n.2 (3d Cir. 1990). A divided Supreme Court concluded that, where the Attorney General has affirmatively certified scope of employment to effectuate removal, federal jurisdiction attaches upon removal, permitting a district court to retain jurisdiction even if the certification is later reversed and the employee resubstituted into the case. *Osborn v. Haley*, 549 U.S. 225, 244-45 (2007); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434-35 (1995). But if the Attorney General does not certify, or in this case, would not have certified, the FTCA confers no jurisdiction at all, *see Osborn*, 549 U.S. at 252 n.17, and the predicate basis for the court to retain jurisdiction over the case vanishes.

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory provisions); *cf. Hui*, 559 U.S. at 807 ("Given Congress' awareness of pre-existing immunity provisions like § 233 when it enacted the Westfall Act, it is telling that Congress declined to enact a similar" provision in § 233(a), referring to 28 U.S.C. § 2679(b)(2) of the Westfall Act) (citation omitted).  Because the FSHCAA and the Westfall Act are "separate statutory scheme[s]," the substitution provision of the Westfall Act is not part of the FSHCAA and cannot be used in this case. *Thomas v. Phoebe Putney Health Sys., Inc.*, 972 F.3d 1195, 1197–98, 1203–04 (11th Cir. 2020).

ARcare's position is even more tenuous when applied in reverse.  Absent some statutory authority (of which we are unaware), a court could never force an individual provider to be the defendant in a case when Plaintiff incorrectly sued the United States.  The United States would merely be dismissed, and the plaintiff would have to file a new action against a new defendant, probably in a new court.

Furthermore, when Congress authorizes courts to force the substitution of a non-party, it requires proper service under Rule 4 of the Federal Rules of Civil Procedure to establish jurisdiction over the non-party and comport with due process.  *See, e.g.*, 28 U.S.C. § 2679(d)(3); Fed. R. Civ. P. 25(a)(3), (b), (c).   The FSHCAA (including § 233(a) – (f)), however, is not only silent as to substitution, but it is silent as to service of process.  *Hinds v. Community Med. Centers, Inc.*, No. 2:22-CV-01207-JAM-AC, 2022 WL 17555525, at *3 (E.D. Cal. Dec. 9, 2022) (interpreting this statutory silence as evidence that "Congress did not intend for the Government's forceful substitution under § 233(a)").  ARcare's statutory construction, which is untethered to the statutory text, would allow courts to force the United States (or a health center/provider) into a lawsuit as a defendant without establishing jurisdiction over the United

States (or a health center/provider), or even affording the United States (or a health center/provider) with notice or an opportunity to be heard. But, as the Supreme Court has counseled, "respect for Congress's prerogatives as policymaker means carefully attending to the words it chose rather than replacing them with others of our own." *Murphy v. Smith*, 583 U.S. 220, 224 (2018).

While ARcare cites a number of unpublished cases that have forced the substitution of the United States over its objection, *see* Dkt. No. 29 at 6, this Court should not follow those decisions, which are not grounded in the text of the statute or in the Federal Rules of Civil Procedure. *See Matter of Terrell*, 39 F.4th 888, 891 (7th Cir. 2022) ("To infer authority for the existence of some practice is circular. Jaywalking and littering are common but not legally authorized."); *cf. Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 22-1395, 2023 WL 8011300 at *10 n.7 (8th Cir. Nov. 20, 2023) (there are two paths: "[t]he first is to follow what other courts have done: turn an assumption into a holding and conclude that [a court can compel substitution of the United States under 42 U.S.C. § 233]. The second is to figure out the right answer ourselves: start with the text, apply first principles, and use the interpretive tools the Supreme Court has provided.").

For all of these reasons, this Court should deny ARcare's motion to substitute.

**B.    ARcare's Deeming Does Not Extend to Cybersecurity Activities Because These Are Not the Delivery of a Health Service.**

As a threshold matter, ARcare has not shown that its deemed status as a PHS employee applies for purposes of implementing cybersecurity measures for its business. ARcare could not be "deemed" for that purpose because cybersecurity is not an approved grant "service" to patients under 42 U.S.C. § 254b. *See supra* I.A; Ex. 1. ARcare's claim to immunity under § 233(a) thus stumbles on the most basic requirement: the deeming determination from HHS did

not include cybersecurity activities.  In other words, cybersecurity activities were not a part of ARcare's "FTCA medical malpractice policy."  Therefore, ARcare cannot be treated as if it were a PHS employee, and so § 233(a) is inapplicable on its face.

ARcare confuses and conflates its FSHCAA coverage with requirements for grant funding.  ARcare claims that its deemed status extends to the conduct described in the Complaint because health centers are required to, among other things, "have an ongoing quality improvement system that includes clinical services and management, and that maintains the confidentiality of patient records," in order to receive grant funding pursuant to 42 U.S.C. § 254b(k)(3)(C).  *See, e.g.,* Mot. to Substitute at 13, Dkt. No. 26.  But, under the FSHCAA, the deeming of a health center applies to *services* it identified in its grant application in section 5A that it would provide to its patients and certain non-patients—not to all actions that a health center may undertake in compliance with 42 U.S.C. § 254b and related regulations.[17]

ARcare informed HHS that it would be providing services such as "general primary care," "diagnostic radiology," "obstetrical care," "behavioral health services," and "nutrition" in its grant application.  *See* Ex. 1.  HHS issued its deeming determination to ARcare based on that list of services.  Thus, because cybersecurity is not such a service, ARcare's deeming does not apply, and it does not receive FTCA coverage for those activities.  Any other interpretation would make the United States the *de facto* insurer of community health centers, which was not

---

[17] In Policy Information Notice ("PIN") 2008-01, HHS's Bureau of Primary Health explained that the scope of a grantee's project would "[d]etermine[] the *maximum potential* scope of coverage (subject to certain exceptions) of the Federal Tort Claims Act (FTCA) program that provides medical malpractice coverage for deemed health centers and most individuals employees[.]"  PIN 2008-01 at 3, *available at* https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pin-2008-01-project-scope.pdf, last visited November 29, 2023; *see id.* at 26 ("FTCA coverage is limited to staff and services that are documented as being within the approved scope of project[.]").  The scope of project includes "services" that the grantee intends to provide, and "services" are defined in 42 U.S.C. § 254b (also known as Section 330 of the Public Health Service Act).  *Id.* at 3, 4, 9.

contemplated by Congress when it drafted the FSHCAA.  *See* H.R. Rep. 102-823, at 6 ("Extending FTCA coverage to grantees . . . will enable them to redirect funds now spent on medical malpractice insurance premiums[.]").

Because ARcare's deemed status does not extend to cybersecurity activities, this Court does not have to engage with ARcare's motion to dismiss, *i.e.*, whether the scope of § 233(a) covers cybersecurity protections.  ARcare has not shown otherwise that it has FTCA coverage for the allegations in Plaintiffs' Complaint, and its claim for immunity under § 233(a) should be summarily denied.

**C.     Claims Based on a Theft Of Patient Information in a Data Breach Are Not Covered By 42 U.S.C. § 233(a).**

It is the United States' position that the motion to dismiss should be also denied because Congress did not make the FTCA's remedy exclusive for all actions against health centers. Rather, Congress provided coverage to alleviate the health centers' need to purchase medical malpractice insurance; for all other events, including theft of patient information from a "data security incident," ARcare was counseled to obtain private insurance.  ARcare's contrary view contradicts the text of § 233(a), the history and purpose of § 233(a) and the FSHCAA, and the sovereign-immunity canon.

**1.     Plaintiffs' data-breach claims do not fit the text of § 233(a).**

The FTCA's remedy against the United States is exclusive only "for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" by Public Health Service employees and deemed employees.  42 U.S.C. § 233(a); 42 U.S.C. § 233(g)(1)(A) ("deeming" provision "[f]or purposes of [42 U.S.C. § 233]").  The federal assumption of liability covers cases in which these functions are the "subject[] matter" of the claim.  *See id.* § 233(a); *Hui*, 559 U.S. at 806.  As the First Circuit observed, this language is a

waiver of sovereign immunity for "suits that sound in medical malpractice." *Mendez v. Bolton*, 739 F.2d 15, 19-20 (1st Cir. 1984) (holding that employment discrimination was not covered by § 233(a)).

ARcare admitted that it suffered a "data security incident that impacted its computer systems" and yet insists it should be immune under § 233(a) as a deemed Public Health Service employee under § 233(g)(1)(A) because data security is a "related function" *to* ARcare's provision of medical care. *See, e.g.,* Mot. to Substitute, at 14-20, Dkt. 26. The statute does not so state; instead, it states that deemed PHS employees are covered only for "medical, surgical, dental, or *related functions*." The *ejusdem generis* canon "instructs courts to interpret a 'general or collective term' at the end of a list of specific items in light of any 'common attribute[s]' shared by the specific terms." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789-90 (2002) (alterations in original) (quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225 (2018)). The ordinary meaning of "function," as referenced in § 233(a), is an "[a]ctivity that is appropriate to a particular business or profession." *Function*, *Black's Law Dictionary* (11th ed. 2019). And here, the acts or omissions giving rise to ARcare's data breach were not "appropriate" to the work of doctors, surgeons, dentists, or like professions (*e.g.*, nurses, therapists, midwives). Rather, the conduct at issue here is the work of network administrators, information-technology specialists, and corporate-compliance officers – all of whom are responsible for maintaining data security on its computer systems. *See* Consol. Class Action Compl., ¶¶ 177-78 (alleging that ARcare failed to "secure and safeguard its computer systems" and failed to "provide data security consistent with industry standards").[18]

---

[18] *See also* ARcare, Inc., "Notice of Data Privacy Incident" ("ARcare experienced a data security incident that impacted its computer systems and caused a temporary disruption to services. ARcare immediately worked to secure its systems and quickly commenced an investigation to confirm the nature

A data breach does not arise out of the type of medical functions—*i.e.*, a provider rendering medical care to a patient—that § 233(a) covers, so ARcare's immunity defense should be rejected. *See Marshall v. Lamoille Health Partners, Inc.*, No. 2:22-cv-166, 2023 WL 2931823, at *5 (D. Vt. Apr. 13, 2023) (denying 42 U.S.C. § 233(a) immunity to community health center facing data breach class action because "the technology-specific allegations in this case do not include 'medical, dental, surgical, or related functions' as required for immunity under the FSHCAA"), *settled on appeal*, Case No. 23-800 (2d Cir.).

Plaintiffs' claims here are not for personal injuries "resulting from" anything ARcare did in a medical or related capacity. *See* 42 U.S.C. § 233(a). The subject matter of their claims does not involve "[a] doctor's failure to exercise the degree of care and skill that a physician or surgeon of the same medical specialty would use under similar circumstances." *See, e.g., Malpractice*, Black's Law Dictionary (11th ed. 2019) (defining "medical malpractice"). Nowhere do Plaintiffs allege that an ARcare provider rendered deficient medical care. Nor do Plaintiffs claim that, in the course of providing treatment, an ARcare doctor improperly collected or released data from Plaintiffs. Plaintiffs do not allege that any of the providers who treated them did anything wrong at all. No providers have been sued here. No providers have even been mentioned in the Consolidated Class Action Complaint.

Rather, Plaintiffs' claims arise from a breach of ARcare's data security system. In protecting the data it collects, ARcare was not acting in its capacity as a medical provider; instead, it was acting in its capacity as a private business that collects data from its customers. The duty to protect valuable data from theft is one that arises in many consumer-facing

---

and scope of the incident."), *available at* https://www.arcare.net/wp-content/themes/altitude-pro/security_notice.html.

industries, and businesses routinely require individuals to provide such data for a variety of

purposes, including, as in this case, data of the type used for billing purposes.  The breach here is

the equivalent, in other words, of failing to prevent an electronic theft of data – not medical

malpractice.

      **2.**       **The history and purpose of § 233 and the FSHCAA show that § 233(a) does not cover data-breach claims.**

The above reading of § 233(a) comports with the history and purpose of § 233(a) and the

FSHCAA.  *See Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (noting that statutory

interpretation "determines meaning by looking not to isolated words, but to text in context, along

with purpose and history").  The statute's text reflects the functions that PHS was authorized to

provide at the time § 233(a) was enacted.  These included the provision of "medical, surgical,

and dental treatment and hospitalization and optometric care . . . at remote medical facilities," 42

U.S.C. § 251(b), as well as the provision of "hospital and medical and dental care, including

outpatient services, services of mobile clinics and public health nurses, and preventive care

including immunizations and health examinations of special groups, such as school children"

under the Indian health and medical service program, 21 Fed. Reg. 9805, 9833, 9834 (Dec. 12,

1956).  In making the statute applicable to "related functions," Congress encompassed

responsibilities of a similar type of those listed.  Congress employed a descriptive phrase

("resulting from the performance of medical, surgical, dental, or related functions") so that its

scope remained flexible enough to (1) encompass the Public Health Service's functions; (2)

encompass physician specialties not specifically referenced (like optometrists or podiatrists) and

certain non-physicians (like nurses, pharmacists, or therapists, to name a few) or who support

and provide health care to patients;[19] and (3) ensure that immunity would not depend on any particular state's definition of medical malpractice.  The Supreme Court has acknowledged, though, that § 233(a) was directed to "malpractice by certain Government health personnel," *see Carlson v. Green*, 446 U.S. 14, 20 (1980), and encompasses claims for medical malpractice pled as constitutional claims for "deliberate indifference as to [patient's] serious medical needs," *see Hui*, 559 U.S. at 803, 813.

When the FSHCAA extended § 233(a) to health centers in 1992, Congress understood that this provision was directed to conduct sounding in medical malpractice.[20]  Congress reiterated this understanding when it made the FSHCAA permanent in 1995.[21]  *See* Pub. L. No. 104-73, 109 Stat. 777 (1995) ("An Act to amend the Public Health Service Act to extend and clarify malpractice coverage for health centers, and for other purposes.").  And the FSHCAA grafted numerous provisions onto § 233 expressly referencing "malpractice."  *See* 42 U.S.C. §§ 233(g)(1)(G)(ii), (g)(2), (h)(1), (m)(2), (n)(1)(A), (n)(1)(D)(i)-(ii), (n)(1)(D)(2)(A)(i), (n)(2)(C), (n)(2)(C)(ii), (n)(2)(D).

---

[19] *See* S. Rep. No. 94-1264, at 3, 8-9, 94th Cong., 2d Sess. (Sept. 20, 1976) (legislative history of the Gonzalez Act, 10 U.S.C. § 1089, one of several malpractice immunity statutes, like 42 U.S.C. § 233, patterned on the Drivers Act).

[20] *See* H.R. Rep. 102-823, at 6 (1992) ("Under the Committee bill, public or private nonprofit entities receiving Federal funds . . . would receive coverage under the FTCA against *medical malpractice claims*."); *id.* at 4 ("The coverage would apply with respect to *medical malpractice claims* . . . ."); *id.* at 6 ("The FTCA would be the exclusive remedy for *medical malpractice claims* against these individuals and programs."); *id.* ("Extending FTCA coverage to grantees . . . will enable them to redirect funds now spent on *medical malpractice* insurance premiums . . . ."); *id.* at 9 ("The Committee anticipates that, by reducing the need for Federally supported health centers to purchase *medical malpractice* insurance coverage, this bill will result in substantial savings to those centers . . . .") (emphasis added).

[21] *See* H.R. Rep. 104-398, at 4 (1995) (noting that "health centers are eligible for coverage for *medical malpractice* under the Federal Tort Claims Act."); *id.* ("Health centers . . . are covered for *malpractice claims* in the same manner as employees of the Public Health Service . . . .") (emphasis added).

Congress, furthermore, commissioned reports on the "government's risk exposure" under the statute, and each report focused on medical malpractice liability.  *See* H.R. Rep. 102-823, at 7 (1992) (requiring a "report on the medical malpractice liability claims experience of covered entitles"); H.R. Rep. 104-398, at 7–8 (1995) (requiring another report on "the medical malpractice liability claims experience of health centers" to address "remaining concerns about the cost-effectiveness of the program").[22]  Put simply, Congress sought to alleviate the financial burden of maintaining insurance for claims arising from misfeasance in the provision of medicine, not to replace other types of insurance.  *See Dedrick v. Youngblood*, 200 F.3d 744, 745 (11th Cir. 2000) ("The Act essentially makes the U.S. government the medical malpractice insurer for qualifying § 254b health centers, their officers, employees, and contractors, allowed these 'deemed' health centers to forgo obtaining private malpractice insurance.").  Nothing in the statutory text or history suggests that Congress opened the United States Treasury to data-breach class actions predicated on cyber-security failures.

> **3.     The sovereign-immunity canon requires rejecting ARcare's expansive interpretation of § 233(a).**

Even if the scope of § 233(a) were uncertain, the doctrine of sovereign-immunity precludes ARcare's expansive reading of the statute to embrace data-breach claims because the scope of immunity afforded to health centers is also a waiver of sovereign immunity for the United States.  *See Jackson v. United States*, No. 20-cv-2347, 2021 WL 2682044, at *2 (E.D. Cal. June 30, 2021).  And "[w]aivers of immunity must be construed strictly in favor of the sovereign" and cannot be "enlarge[d] . . . beyond what the language requires."  *Ruckelshaus v.*

---

[22] *See also* H.R. Rep. 102-823, at 7 (1992) ("[C]overed entities must have implemented appropriate policies and procedures to reduce the risk of medical malpractice and the risk of malpractice suits."); *id.* ("[A] covered entity must have no history of malpractice claims having been filed against it or its officers, employees, or contractors.").

*Sierra Club*, 463 U.S. 680, 685 (1983).  The Supreme Court has directed lower courts that when the interpretation of a statutory phrase implicates the scope of a waiver of sovereign immunity, it requires a narrow construction "so as not to "expand the scope of Congress' sovereign immunity waiver beyond what the statutory text *clearly requires*."  *Federal Aviation Administration v. Cooper*, 566 U.S. 284, 299 (2012) (emphasis added).  Because the statutory text of § 233(a) does not clearly require a waiver of sovereign immunity, this Court should deny ARcare's motion to dismiss.

### 4.   Cases cited by ARcare are poor authority for construing § 233(a) to cover data breach claims.

The cases (*Ford* and *Mixon*[23]) on which ARcare relies are unpersuasive authority for construing § 233(a) to cover these data-breach claims.  *Ford* and *Mixon* misapply *Hui v. Castaneda*, 559 U.S. 799 (2010), in which PHS personnel provided substandard medical care to a patient suffering from penile cancer, resulting in amputation and death.  *Id.* at 802–03.  *Hui* holds that the immunity in § 233(a) does not depend on whether a particular cause of action is specifically labeled "medical malpractice," and it covers constitutional claims for "deliberate indifference to [a patient's] serious medical needs."  *Id.* at 803.  Nothing in *Hui* disturbs the principle—borne out by the text, purpose, and history of § 233 and FSHCAA —that § 233(a) is directed at *conduct sounding in* traditional medical and related-professional malpractice torts. *See supra* pp. 13-14; *see also Hui*, 559 U.S. at 808, 812–13 (holding that "the text of § 233(a)

---

[23] Two of those cases were decided by the same judge; one of those cases is now on appeal, while the other was dismissed.  *Ford v. Sandhills Med. Found., Inc.*, 4:21-cv-02307, 2022 WL 1810614, at *1 (D.S.C. June 2, 2022), *on appeal*, No. 22-2268 (4th Cir.); *Mixon v. CareSouth Carolina, Inc.*, 4:22-cv-269, 2022 WL 1810615, at *1 (D.S.C. June 2, 2022).  The third case, *Doe v. Neighborhood Healthcare*, No. 21-cv-1587, 2022 WL 17663520 (S.D. Cal. Sept. 8, 2022), was also dismissed when plaintiff failed to exhaust administrative claims.

plainly indicates that it precludes a *Bivens* action against petitioners *for the harms alleged in this case*") (emphasis added).

ARcare relies on other non-precedential decisions, none of which involves cyberattacks or data breaches, and all of which fail to weigh the actual text, history, and purpose of § 233 and the FSHCAA.  Nor do they account for sovereign immunity.  These cases effectively read the phrase "medical, surgical, dental, or related functions" to mean any activity "related to" medical care.  But the statute does not provide immunity for any activity "related to" medicine, surgery, or dentistry.  The statute speaks to "related *functions*"—and gives the example of "the conduct of clinical studies or investigation," *i.e.*, the roles, duties, and work of the PHS that are similar in nature to its medical, surgical, and dental functions that derive from direct medical care.  *See Black's Law Dictionary* (11th ed. 2019) (defining "function").  This Court's choice is to either follow what other courts have erroneously assumed, or to figure out the right answer for itself, starting with the text, applying first principles, and using interpretive tools that the Supreme Court has provided.  *See Ark State Conf. of NAACP*, 2023 WL at *10 n.7.

Data breaches, by contrast, occur just as readily in countless other industries or professions outside of medicine, surgery, or dentistry; it is not a "related function" under § 233(a).  *Marshall*, 2023 WL 2931823, at *5 ("None of these technology-related activities were "interwoven" with the provision of medical care. They instead consisted of security-related work by information technology and compliance personnel in a health care setting."); *see Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."); *cf. Hiscox Ins. Co. Inc. v. Warden Grier, LLP*, 474 F. Supp. 3d 1004, 1008

(W.D. Mo. 2020) (holding that the alleged failure to protect sensitive information "is not inherently dependent on an attorney's negligent performance of professional services, as evidenced by the plethora of cases alleging data breach by various service providers," and "[t]he allegation that [an attorney] maintained (or failed to maintain) the data itself does not necessarily transform the claim into one for legal malpractice").

### III.    CONCLUSION

For the reasons described above, this Court should deny ARcare's motion.  ARcare's motion to substitute the United States should be denied because ARcare has shown this Court no authorization for this proposed substitution.  ARcare's motion to dismiss should be denied for two reasons.  ARcare's deemed status does not extend to cybersecurity activities, and therefore the "FTCA medical malpractice policy" does not apply.  Furthermore, ARcare's claim to suit immunity under § 233(a) should be rejected as data breach cases do not fit the text of § 233(a), the purpose and history of the FSHCAA, and the sovereign immunity canon.

Respectfully submitted,

JONATHAN D. ROSS,
United States Attorney

By: SHANNON S. SMITH
Bar No. 94172
Assistant U.S. Attorneys
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
shannon.smith@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I further certify that on said date, I sent by U.S. Mail a copy of this filing to:

Bryan L. Bleichner
Chestnut Cambronne PA
100 Washington Avenue South Suite 1700
Minneapolis, MN 5540
Bbleichner@chestnutcambronne.com

Gary M. Klinger
Milberg Coleman Bryson Phillips Grossman PLLC
227 West Monroe Street Suite 2100
Chicago, IL 60606
Gklinger@milberg.com

William B. Federman
Federman & Sherwood
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Wbf@federmanlaw.com
Joseph M. Lyon
The Lyon Firm, LLC
2754 Erie Avenue
Cincinnati, OH 45208
Jlyon@thelyonfirm.com

Joshua Sanford
Sanford Law Firm, PLLC
Kirkpatrick Plaza, Suite 510 10800 Financial Centre Parkway
Little Rock, AR 72211
Josh@sanfordlawfirm.com

Joseph D. Gates
Gates Law Firm, PLLC
2725 Cantrell Road Suite 105
Little Rock, AR 72202
USA
Gates@gateslawpllc.com

Christopher D. Jennings
Johnson Firm
610 President Clinton Avenue Suite 300

29

Little Rock, AR 72201
Chris@yourattorney.com

Francesca Kester Burne
Morgan & Morgan, P.A.
One Tampa City Center 201 North Franklin Street Suite 700
Tampa, FL 33602
Fkester@forthepeople.com

Jean Sutton Martin
Morgan & Morgan Complex Litigation Group
201 North Franklin Street Suite 700
Tampa, FL 33602
Jeanmartin@forthepeople.com

Nathan Irving Reiter, III
Johnson Firm
610 President Clinton Avenue Suite 300
Little Rock, AR 72201
Nathan@reiterlaw.com

Anthony L. Parkhill
Barnow and Associates, P.C.
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Aparkhill@barnowlaw.com

Gary E. Mason
Mason LLP
5335 Wisconsin Avenue NW Suite 640
Washington, DC 20015
Gmason@masonllp.com

Shawn Bradley Daniels
Daniels Law Firm, PLLC
129 West Sunbridge Drive
Fayetteville, AR 72703
Shawn@danielsfirm.com

Matthew Sidney Freedus
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, Dc 20036
Mfreedus@ftlf.com

Andrea L. Kleinhenz

Wright, Lindsey & Jennings
3333 Pinnacle Hills Parkway, Suite 510
Rogers, AR 72758-8960
Akleinhenz@wlj.com

Gary D. Marts, Jr.
Wright, Lindsey & Jennings
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Gmarts@wlj.com

Scott Andrew Irby
Wright, Lindsey & Jennings
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Sirby@wlj.com

By: SHANNON S. SMITH
    Bar No. 94172
    Assistant U.S. Attorneys
    P.O. Box 1229
    Little Rock, AR 72203
    (501) 340-2600
    shannon.smith@usdoj.gov